UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ALFRED,

        Plaintiff,

vs.

GRAPHIC PACKAGING INTERNATIONAL, INC.,

        Defendants.
        _____/

Case No. 1:09-cv-335

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

Plaintiff filed a civil rights action against defendant arising from the termination of his employment in March 2007. This matter is now before the court on defendant's unopposed motion for summary judgment (docket no. 21).

    **I.**    **Plaintiff's claims**

    **A.**    **Procedural background**

Plaintiff filed two lawsuits in this court: *Alfred v. Altivity/Michigan Paperboard*, 1:09-cv-335 (sometimes referred to as "case no. 335"), and *Alfred v. Altivity/Michigan Paperboard*, 1:09-cv-336 (sometimes referred to as "case no. 336"). The complaint in case no. 335 alleged that defendant discriminated against plaintiff due to his race and color in violation of 42 U.S.C. § 2000e-2 (Title VII of the Civil Rights Act of 1964). In case no. 336, plaintiff utilized a pre-printed form intended for alleging an age discrimination claim under the Age Discrimination in Employment Act of 1967 (ADEA). However, the complaint and attachments in case no. 336 indicated that this action was brought as a disability discrimination claim under the Americans with Disabilities Act (ADA)

rather than as an age discrimination claim under the ADEA. For example, the correspondence from the U.S. Equal Employment Opportunity Commission (EEOC) attached to the complaint in case no. 336 referenced plaintiff's claims as arising from "intentional discrimination based on his race or alleged disability." EEOC letter (Jan. 9, 2009) (docket no. 1-2). Moreover, plaintiff made it clear that he was asserting a claim under the ADA rather than the ADEA, when he testified that the claims in this lawsuit were limited to claims for "disability discrimination" and "race discrimination." Alfred Dep. at pp. 14-15 (docket no. 22-5). Accordingly, the court construes the complaint in case no. 336 as seeking relief for a violation of the ADA, 42 U.S.C. § 12101 *et seq.* The court consolidated case nos. 335 and 336 under the lead case, no. 335, and assigned the consolidated case a new caption of *Alfred v. Graphic Packaging International, Inc. See* docket no. 17.

### B. Defendant's accommodation of plaintiff's medical conditions

Defendant employed plaintiff in April or May 2004. *See* Factory Application (docket no. 22-2) (dated April 26, 2004) and Hourly Employee Orientation Checklist (dated May 21 2004) (docket no. 22-3).[1] Approximately six months after his employment, plaintiff requested a leave of absence in November 2004 due to surgery related to a medical condition (sarcoidosis). Alfred Dep. at p. 47 (docket no. 22-5). In a letter dated December 30, 2004, plaintiff's physician, Stephen W. Robinson, M.D., stated that plaintiff suffered from a severe case of sarcoidosis and issued the following work restrictions:

---

[1] For purposes of this report and recommendation, the term "defendant" refers to Graphic Packaging International, Inc., and its predecessor entities which employed plaintiff since 2004. The record reflects that these entities included, but were not limited to, the following: Field Container Company (docket no. 22-2); MPC (docket no. 22-3); Altivity Packaging Michigan Paperboard Mill (docket nos. 22-4, 22-20, 22-21, 22-23, and 22-24); Michigan Paperboard (docket nos. 22-5 and 22-12); and Michigan Paperboard Company (docket nos. 22-7, 22-13, 22-14, 22-15, 22-16, 22-17, 22-18 and 22-19);

> His work limitations therefore should consist of a work day not to exceed 8 hours, occasional squatting only, and walking at a pace that is comfortable to him. He should not be exposed to excessive odors, chemicals, dust or fibrous materials. He may, however, travel through or remain briefly in such conditions as long as he is wearing an industrial mask for his protection. He should not lift in excess of 25 pounds at a time, and should avoid repetitive or prolonged lifting duties.

Dr. Robinson letter (Dec. 30, 2004) (docket no. 22-6); Alfred Dep. at p. 60. Defendant allowed Dr. Robinson to tour the plaint and review the jobs plaintiff was performing. Alfred Dep. at p. 60. Ms. Kester, defendant's Human Resources Manager, met with plaintiff and others to discuss possible accommodations. Declaration of Sandy Kester at ¶¶ 1-3 (docket no. 22-12). After reviewing plaintiff's work restrictions, Ms. Kester advised him that "we do not have any positions available at this time within your restrictions." Kester letter (Jan. 18, 2005) (docket no. 22-7).

On February 8, 2005, plaintiff met with company representatives and others to discuss potential accommodations. *See* Kester Decl. at ¶ 3; Kester notes (Feb. 8, 2005) (docket no. 22-8). Ms. Kester's meeting notes reflect that plaintiff wanted help finding an accommodation based on his condition, that plaintiff was willing to wear a respirator at work, and that plaintiff willing to investigate other accommodations with his physician. *See* Kester notes. On March 29, 2005, Dr. Robinson issued a revised work restriction:

> Work day may exceed 8 hrs but only 4 hrs in areas of high humidity & heat. May lift, no weight restrictions, must wear mask when working. Pt to make administration aware of any problems.

Dr. Robinson's restrictions (March 29, 2005) (docket no. 22-9). Defendant found plaintiff a position with these restrictions, purchased plaintiff respirators and allowed him to commence work on April 16, 2005. Kester e-mail (April 15, 2005) (docket no. 22-10); Alfred Dep. at 62.

On July 1, 2005, Dr. Robinson revised plaintiff's restrictions due to his reported problems with heat and humidity while working the second shift. Dr. Robinson restriction (July 1,

2005) (docket no. 22-11). Dr. Robinson expressed his medical opinion that plaintiff should only work third shift and that if overtime was expected, he should work no more than four hours at the beginning of first shift or four hours at the end of second shift. *Id.* The doctor also stated that plaintiff's "medical condition is getting better with treatment." *Id.* Even though plaintiff was not entitled to a third shift position under the collective bargaining agreement (due to his limited seniority), the company, with the union's support, transferred plaintiff to this shift in July 2005 pursuant to the doctor's accommodation request. Kester Decl. at ¶ 4; Alfred Dep at pp. 65-66.

Plaintiff suffered injuries at work in September 2006 "while moving a large bulk paper roll." Alfred Dep. at p. 93. He was allowed to take time off work in October or November 2006 for medical problems, which apparently related to his injuries. *Id.* at pp. 92-93. In February and March 2007, plaintiff was undergoing physical therapy to treat his injuries. *Id.* at p. 105. Plaintiff's physical therapy appointments were scheduled in the morning, at a time when he might otherwise be required to work forced overtime after the third shift. *Id.* Even though plaintiff had exhausted his leave under the FMLA, defendant agreed not to schedule plaintiff for forced overtime on his days with scheduled physical therapy. Defendant's memo (Jan. 16, 2007) (docket no. 22-21); Alfred Dep. at pp. 101, 104, 112-13.

### C. Plaintiff's disciplinary record

The record reflects that plaintiff received several disciplinary warnings during the course of his employment. On August 28, 2005, plaintiff received a "Written Verbal Warning" for failing to follow prescribed work procedures when he punched into work too early on August 23rd. Report of employee performance of conduct (docket no. 22-13). Plaintiff did not dispute the warning, but testified that he punched in one minute too early. Alfred Dep. at pp. 66-67. On

4

November 28, 2005, plaintiff tested positive for marijuana use during a random drug test. *Id.* at pp. 68-69. The positive drug test initiated a Last Chance Agreement. *Id.* at p. 71. Under this agreement, dated December 8, 2005, defendant allowed plaintiff to maintain his employment even though he violated defendant's drug and alcohol policy. Last Chance Agreement (docket no. 22-14). Plaintiff received an unpaid suspension and agreed that "any future violation of the Drug and Alcohol Policy during my employment will result in my termination." *Id.*

On March 6, 2006, defendant issued a Written Warning to plaintiff for failing to follow prescribed safety procedures when he entered a pit conveyor without engaging the lockout. Report of employee performance or conduct (docket no. 22-15); Alfred Dep. at pp. 77-78. Plaintiff received three disciplinary actions during the summer of 2006: on June 6th, he received a Written Verbal Warning for failing to report for work "without notification one (1) hour before the start of his scheduled starting time with regards to an absence;" on August 16th, he received a "Second 'C' Violation Written Warning in a twelve month period," for not being at his assigned work place on August 13th; and, on August 21st, plaintiff received a "Third 'C' Violation Written Warning in a twelve month period" for visiting company premises outside of working hours without authorization of management. *See* Reports of employee performance or conduct (docket nos. 22-16, 22-17 and 22-18). On September 23rd, defendant issued plaintiff another Written Verbal Warning for failing to follow prescribed safety procedures on September 21st, when he failed to properly engage the lockout for the no. 1 conveyor. *See* Report of employee performance or conduct (docket no. 22-19). Then, plaintiff received his "Fourth 'C' Violation Written Warning in a twelve month period" for an event on October 20, 2006, when he failed to report for work without notification one (1) hour

5

before the start of his scheduled starting time with regards to an absence. *Id.* (docket no. 22-20). Plaintiff was suspended one week for the last referenced violation. *Id.*

### D. Defendant's termination of plaintiff's employment

Defendant terminated plaintiff's employment after a series of events that occurred in March 2007. During that time, plaintiff was taking Vicodin for his back pain, an antihistamine for an allergic reaction, and other medication. Alfred Dep. at pp. 114-15. Plaintiff testified that he would cut the Vicodin in half to reduce the side effects of the pill. *Id.* Plaintiff stated that he took Vicodin after his work shift because he was "afraid" of how the medication would affect him at work. *Id.* at p. 116. Ms. Kester stated that prior to the incident which resulted in plaintiff's termination, plaintiff had not reported to her that he was taking medication that could cause him to fall asleep at work or go home because he did not feel well. Kester Decl. at ¶ 6.[2] Plaintiff admitted that he did not tell any of defendant's employees that he was taking Vicodin or the antihistamine in March 2007. Alfred Dep. at pp. 115-16.

On Saturday, March 3, 2007, plaintiff arrived for work shortly before 11:00 p.m. *Id.* at p. 121. At 11:30 p.m., plaintiff's supervisor, Mr. Blunk, gave plaintiff a list and instructed him to clean the listed areas. *Id.* at p. 123. Plaintiff considered the list "frivolous" and decided to help other employees. *Id.* He did not obtain permission from Blunk or anyone else to perform other work. *Id.* at pp. 125-26. When plaintiff did start working on the cleaning list, he "got extremely sick" and went out for some fresh air. *Id.* at 125-27. Plaintiff came back inside and sat down in "this other little work area." *Id.* at pp. 126-27. This work area, known as the "old A sheeter control

---

[2] The court notes that Ms. Kester's declaration includes two paragraphs numbered "6." *See* docket no. 22-12. This statement appears in the first paragraph number 6. *Id.*

6

room" was not in use at the time. *Id.* at pp. 127-28. Plaintiff testified that he shut the door, sat down and "passed out" in the room due to the antihistamine and pain medication. *Id.* at pp. 128-30, 139. However, plaintiff also testified that the medication caused drowsiness, and that he did not know if he actually "passed out." *Id.* at pp. 130, 139. When plaintiff "came to," other employees were outside of the room. *Id.* at p. 132. After Mr. Blunk discovered plaintiff, and was escorting him out, plaintiff tried to explain the situation, telling Blunk, "You don't need to do this to me, give me another chance." *Id.* at pp. 130, 132. Plaintiff told the union steward, Jerry Wagner that "this was caused by the medication." *Id.* at p. 132. However, plaintiff did not tell Mr. Blunk, or anyone else, that he needed medical attention at that time. *Id.* at pp. 133-34. Plaintiff clocked out at 1:53 a.m. on Sunday, March 4th, having worked slightly less than three hours. *Id.* at p. 134. Plaintiff drove himself home and did not seek any medical attention that day. *Id.* at pp. 134-35. On Monday, March 5th, plaintiff saw Dr. Robinson, who gave him a note indicating that plaintiff's medications could cause drowsiness. *Id.* at p. 135; Dr. Robinson note (March 5, 2007) (docket no. 22-22).

On March 9, 2007, defendant terminated plaintiff's employment for two reasons. First, Mr. Blunk reported that plaintiff had committed a second violation of the drug and alcohol policy. *See* Report of employee performance or conduct (docket no. 22-23); Last Chance Agreement at ¶ 9; Kester Decl. at ¶ 7; Defendant's "Rules to Work With" (docket no. 22-4). Plaintiff's actions violated defendant's "Rules to Work With," which prohibited employees from reporting to work unfit for duty as a result of alcohol or drug use, and required employees to supply their supervisor "with a doctor's release, prior to starting work, if drugs or other medication are being used which the Employee has reason to believe may impair judgment, coordination, or affect other senses necessary for safe, productive performance at work." *See* docket no. 22-4 at p.18. The cited

7

violation (Rule A-1) could result in immediate suspension "with possible termination for the first offense." *Id.* at p. 1.

Second, defendant terminated plaintiff's employment on the separate basis of habitual violation of work rules, i.e., being outside of his work area in an abandoned area (a violation of Rule B-5, "[s]leeping on the job"), which constituted plaintiff's sixth work rule violation in a twelve month period. *See* Report of employee performance or conduct (docket no. 22-24); Kester Decl. at ¶ 7; "Rules to Work With" at p.3 (docket no. 22-4). Plaintiff was not replaced after his termination, his duties being assumed by other employees. Kester Decl. at ¶ 8.

Plaintiff filed a grievance with the union regarding his termination, which the union denied. Alfred Dep. at pp. 145-46. Plaintiff did not appeal the union's decision. *Id.* at p. 149. Plaintiff also filed an unfair labor practice charge with the National Labor Relations Board, which that agency dismissed. *Id.* at pp. 149-50. Plaintiff also filed a complaint with the Michigan Occupational Safety and Health Administration. *Id.* at p. 135. The record does not reflect the disposition of this complaint filed with the state authorities. *Id.* In addition, plaintiff filed charges of race discrimination and disability discrimination with the Michigan Department of Civil Rights and the EEOC. *Id.* at p. 165. These complaints were dismissed for insufficient evidence in October 2008. *Id.* at pp. 166-67. Finally, at some point after his termination, plaintiff applied for Social Security Disability Insurance Benefits. *Id.* at p. 168. An administrative law judge awarded benefits in July 2008, finding that plaintiff had been disabled since March 9, 2007 (the date defendant terminated his employment). *Id.* at pp. 168-69, 172.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Defendant's motion is unopposed. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of

9

genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405-6 (6th Cir. 1992) (in such instances, it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion").

**III.     Discussion**

**A.     Plaintiff's ADA claim**

At the time that defendant terminated plaintiff's employment, the ADA provided in pertinent part that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Defendant does not dispute that it is subject to the ADA.[3]

Under the ADA, a plaintiff must demonstrate direct evidence of disability discrimination or establish a prima facie case of discrimination under the familiar *McDonnell Douglas* framework. *See Sullivan v. River Valley School District*, 197 F.3d 804, 810 (6th Cir.1999), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To establish a prima facie case of discrimination under the ADA, plaintiff must show that:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

---

[3] Defendant points out that the ADA Amendments Act of 2008, effective on January 1, 2009, Pub. L. No. 110-325, § 8, 122 Stat. 3553, do not apply retroactively to plaintiff's claim, which arose on March 9, 2007. *See Milholland v. Sumner County Board of Education*, 569 F.3d 562, 566-67 (6th Cir. 2009).

10

*Hedrick v. Western Reserve Care System*, 355 F.3d 444, 453 (6th Cir. 2004), quoting *Monette v. Electronic Data Systems Corporation*, 90 F.3d 1173, 1186-87 (6th Cir. 1996). Once the plaintiff has established a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action. *Id.* If the employer articulates such a reason, then the plaintiff must show that the reason given by the employer is pretextual in order to prevail. *Id.* "Under this scheme, the plaintiff retains the burden of persuasion at all times." *Id.* Here, as discussed below, the record does not reflect direct evidence of disability discrimination.

Defendant asserts two grounds for summary judgment. First, plaintiff has failed to establish a prima facie case of disability discrimination. Second, even if plaintiff could establish a prima facie case of disability discrimination, he was terminated for legitimate, non-discriminatory reasons.

### 1. Social Security determination

Defendant contends that plaintiff failed to establish a prima facie case of disability discrimination because he was under a Social Security disability as of March 9, 2007 and was not qualified to perform the essential functions of his job. The Sixth Circuit addressed this issue in *Olds v. United Parcel Service, Inc.*, 127 Fed. Appx. 779, 783-84 (6th Cir. 2005). In *Olds*, the employer asserted that the plaintiff could not establish one element of a prima facie case of disability discrimination, i.e., that he was otherwise qualified for the position, "because an administrative law judge found him entitled to Social Security Disability benefits." The Sixth Circuit denied the employer's motion for summary judgment, reasoning as follows:

> Under the Supreme Court's decision in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), Olds is required to give a "sufficient explanation" as to how he can perform the essential functions of the job, given the Social Security Administration's determination of total disability.

11

> However, because the Social Security Administration assesses only what a claimant can do, while the relevant inquiry under the ADA asks what the claimant can do *with or without accommodation*, the only explanation that a plaintiff need provide is that he can perform the work in question *with accommodation*. As stated by the Supreme Court:
>
> > To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement [to the Social Security Administration], the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."
>
> *Id.* Because Olds has suggested two accommodations, namely, either a transfer to another position, or permission to use the dolly cart and to request customer assistance with packages over 40 pounds, it appears that he can provide a satisfactory "explanation."

*Olds*, 127 Fed. Appx. at 783-784.

Under the facts in this case, however, the court concludes that defendant is entitled to summary judgment on this theory. The record reflects that plaintiff was found disabled under the Social Security Act as of his employment termination date of March 9, 2007. As discussed in *Olds* and *Cleveland*, this determination, in and of itself, is not sufficient to bar plaintiff from establishing a prima facie case of disability discrimination under the ADA. Here, plaintiff testified that he received disability under the Social Security Act because: he was unable to work; "[he] could not do the work [he] did before with or without reasonable accommodation;" and that he could not adjust to other types of work due to his medical condition. Alfred dep. at pp. 168-69. Unlike the plaintiff in *Olds*, plaintiff did not provide a satisfactory explanation that he could perform his work "with accommodation." Rather, plaintiff conceded that he could not do his previous work "with or without reasonable accommodation." This concession is not a "satisfactory explanation" that

plaintiff was qualified for the position. Accordingly, the court agrees with defendant that plaintiff has failed to establish a prima facie case of disability discrimination.

### 2. Defendant terminated plaintiff's employment for legitimate, non-discriminatory reasons

Even if plaintiff had demonstrated a prima facie case of disability discrimination, plaintiff has offered two legitimate, non-discriminatory reasons for terminating his employment. First, plaintiff was terminated for violating the terms of his Last Chance Agreement. *See* docket no. 22-23. Second, plaintiff was terminated for habitual work rule violations, having accumulated six violations of work rules within a twelve month period. *See* docket no. 22-24. Plaintiff has not persuaded the court that the reasons given for his termination were a mere pretext for disability discrimination. The record reflects that defendant accommodated plaintiff's medical condition and found plaintiff work consistent with Dr. Robinson's work restrictions. Such action is inconsistent with plaintiff's claim of disability discrimination. On the other hand, plaintiff's failure to comply with defendant's work rules is well documented, including the fact that he had been working under the terms of a Last Chance Agreement since December 8, 2005. Accordingly, defendant is entitled to summary judgment on plaintiff's ADA claim.

### B. Plaintiff's Title VII claim for race discrimination

Plaintiff also brings a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. Plaintiff's allegations fall within § 2000e-2(a)(1), which provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer":

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

42 U.S.C. § 2000e-2(a)(1).

In order to establish a discrimination claim under Title VII, a plaintiff must produce either direct or circumstantial evidence of discrimination. *Grizzell v. City of Columbus Division of Police*, 461 F.3d 711, 719 (6th Cir. 2006). Plaintiff neither alleged nor presented direct evidence of race discrimination. For this reason, the court will review plaintiff's race discrimination claim, like the disability discrimination claim, under the *McDonnell Douglas* framework. To establish a *prima facie* case of race discrimination, plaintiff must demonstrate by a preponderance of the evidence: (1) that he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that he was replaced by a member of an unprotected class or treated differently from similarly situated members of the unprotected class. *McDonnell Douglas Corp.*, 411 U.S. 792; *Hoskins v. Oakland County Sheriff's Department*, 227 F.3d 719, 731 (6th Cir. 2000). As with the ADA claim, if a plaintiff establishes a *prima facie* case, then an inference of discrimination arises, and the burden of production shifts to the employer to to set forth a legitimate, non-discriminatory reason for plaintiff's discharge. *Hoskins*, 227 F.3d at 731. Then, the plaintiff must prove that the employer's proffered reason for taking the adverse action was pretextual. *Id.*

Defendants are entitled to summary judgment on plaintiff's race discrimination claim for the same reasons applicable to his disability discrimination claim. First, plaintiff cannot establish a prima facie case of discrimination because he was not qualified for the position. *See* discussion in § III.A.1, *supra*. Second, even if plaintiff could establish a prima facie case of race discrimination, he was terminated for legitimate, non-discriminatory reasons. *See* discussion in § III.A.2, *supra*.[4]

---

[4] In addition, the court agrees with defendant that plaintiff has not established a prima facie case of race discrimination because plaintiff failed to demonstrate that he was treated differently from similarly

14

### IV. Recommendation

Accordingly, I respectfully recommend that defendant's motion for summary judgment (docket no. 21) be **GRANTED** and that this case be dismissed.

Dated: April 14, 2010    /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

---

situated Caucasian employees. On the contrary, plaintiff testified that a Caucasian employee, who was subject to a Last Chance Agreement like plaintiff, was terminated for sleeping on the job. Alfred Dep. at pp. 162-63.